**JONES TRIAL ATTORNEYS**
SEAN M. JONES, ESQ./LL.M.
Wells Fargo Plaza, 20th Floor
401 B Street, Suite 2010
San Diego, California 92101
T: (619) 732-6377
F: (619) 730-7111
E: Sean@JonesTrialAttorneys.com

Attorneys for Plaintiffs,
MADDOX DEFENSE, INC., a California corporation, and
ENVIROTECH VEHICLES, INC., a Delaware corporation

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MADDOX DEFENSE, INC., a California corporation; ENVIROTECH VEHICLES, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>v.<br><br>EFRAIM DIVEROLI, an individual; KINGBIRD VENTURES, LLC, a Wyoming LLC; VD ACQUISITIONS, LLC, a Nevada LLC; and DOES 1–50,<br><br>    Defendants. | **CASE NO.**  '26 CV 2992 BAS AHG<br><br>**COMPLAINT FOR:**<br>1. **Civil Extortion**<br>2. **Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)**<br>3. **Fraudulent Inducement**<br>4. **Tortious Interference with Prospective Economic Advantage**<br>5. **Tortious Interference with Contract**<br>6. **Abuse of Process**<br>7. **Declaratory Relief**<br>8. **Injunctive Relief (28 U.S.C. § 2202)**<br>9. **Civil Conspiracy**<br>10. **Unfair Competition (Cal. Bus. & Prof. Code § 17200)**<br>**DEMAND FOR JURY TRIAL** |

1
COMPLAINT

Plaintiffs MADDOX DEFENSE, INC., a California corporation ("Maddox Defense") and ENVIROTECH VEHICLES, INC., a Delaware corporation ("EVTV") bring this action against EFRAIM DIVEROLI, an individual ("Diveroli"); KINGBIRD VENTURES, LLC, a Wyoming LLC ("Kingbird"); VD ACQUISITIONS, LLC, a Nevada LLC ("VD Acquisitions"); and DOES 1 - 50.

## COMPLAINT

## I.    INTRODUCTION

1.    This case arises out of a multi-year extortion and litigation-abuse scheme orchestrated by Defendant Efraim Diveroli, a repeat litigant notorious for weaponizing baseless lawsuits to force businesses into transactions that benefit him financially.

2.    Diveroli and Jason Maddox ("Maddox") first became acquainted in 2020 when Maddox Defense was selected by the United States government to assist in supplying custom-made medical gowns during the Covid-19 pandemic. Despite Maddox's repeated rejections and despite being expressly barred from participating in such government contracts on account of his history of defrauding the United States Government, Diveroli continuously attempted to insert himself into Maddox Defense's operations, inappropriately holding himself out as Maddox's business partner, and causing Maddox significant losses due to actual partners, manufacturers, and distributors who insisted on keeping an arm's length distance from Diveroli. Diveroli repeatedly and falsely claimed that a narrow exception to his disbarment from government contracting, that allowed him to sell Commercial Off-the-Shelf Goods, rendered him eligible to assist Maddox Defense in machining and supplying custom-made medical gowns not offered or available "on-the-shelf" anywhere.

3.    In 2022, after repeatedly sending out demand letters and draft lawsuits through various attorneys and law firms, Diveroli, through his company Medlink, ultimately sued Maddox Defense while also frivolously seeking restraining orders and injunctions against Maddox and several related defendants, claiming that Maddox was

attempting to murder him. These claims while facially ridiculous, were made even more ridiculous by the fact that Diveroli waited approximately two years after first circulating the demand letters and draft complaints to actually seek such "emergency" orders through the court.

4.     Diveroli also sought emergency bank account freezes on the basis that Maddox was allegedly hiding money in "foreign offshore" accounts in Puerto Rico, apparently not realizing that Puerto Rico is a United States territory. Not surprisingly, Diveroli's requests for restraining orders and preliminary injunctions were denied. Plaintiffs anticipate that if Diveroli proceeds with his threatened lawsuits, discussed further below, he will likely regurgitate the same ridiculous requests.

5.     In April 2025 as the Medlink case was proceeding to trial, Diveroli's attorney begged and pleaded with the Court to be let off the case after Diveroli stopped paying his bills and answering calls and emails. Judge Cheeks ultimately allowed Diveroli's attorney to withdraw and subsequently dismissed the lawsuit for failure to prosecute.

6.     However, during the pendency of the Medlink/Maddox litigation, proceedings were temporarily paused in the fall of 2023 when, during a Mandatory Settlement Conference, the parties agreed to attempt to jointly pursue a fuel deal proposed by Diveroli, wherein Diveroli would provide a fuel supplier, and Maddox would supply a customer (the "Fuel Agreement"). If successful, the deal would be so mutually profitable as to render the squabbling over the medical gown contract insignificant.

7.     Maddox acted in good faith in pursuing the fuel deal with Diveroli's company VD Acquisitions, including flying to India to meet with the purported suppliers, only to find out that there was no legitimate supply and they had never made such promises to Diveroli. The entire endeavor was dead on arrival and ultimately amounted to a huge waste of time and money for Maddox.

8.      In the fall of 2025, Bront Bird ("Bird"), who acts as Diveroli's agent—his messenger, his pressure-applicator, and his insider pipeline—carried threats, conveyed ultimatums, transmitted confidential information, presented an opportunity to EVTV to enter into a gold mining merger with Fenix Oro. The proposal was met with confusion and skepticism by EVTV's officers. Bird then revealed that Diveroli was involved in the deal and would file lawsuits against EVTV, Maddox Defense, and their officers, and circulate litigation notices and evidence preservation letters to a lengthy list of EVTV and Maddox Defense's valued contacts (the obvious suggestion being that letters would harm EVTV's and Maddox's relationships with those contacts).

9.      Shortly thereafter, Diveroli's attorney sent demand letters and draft lawsuits to EVTV's attorneys. Bird then relayed to Maddox that he could make those lawsuits go away if Maddox forced the Fenix Oro deal through. When Maddox explained to Bird that involving a public company in such a deal would require significant due diligence in order to determine whether it would align with EVTV's business purpose and would be in shareholders' interest, Bird became increasingly impatient, demanding an immediate decision, and stating that if the deal didn't go through, Diveroli would destroy EVTV.

10.     Bird additionally admitted that Diveroli and affiliates had interfered with EVTV's investment banking relationships, including contacting AGP with threats, scaring off bankers, and clouding active financing for EVTV.

11.     In effect, Diveroli is creating problems for EVTV for the purpose of then bringing a derivative shareholder action based on those same problems. Diveroli purchased his stake in EVTV expressly for the purpose of bringing a derivative suit – in line with his business practice (according to Bird) of buying shares for the purpose of suing the company and tapping into Directors & Officers (D&O) insurance and collecting settlements.

4
COMPLAINT

12. Plaintiffs bring this action because Diveroli's pattern has reached the point of extortion, securities manipulation, RICO activity, and tortious interference, all to compel Plaintiffs into a massively dilutive, fraudulent merger, or in the alternative pursue a fraudulent and manufactured derivative suit.

## II. JURISDICTION AND VENUE

13. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege violations of RICO, 18 U.S.C. § 1961 et seq.

14. Supplemental jurisdiction exists under 28 U.S.C. § 1367.

15. Venue is proper under 28 U.S.C. § 1391(b) because:

(a) many acts occurred in this District;

(b) Plaintiffs reside and conduct business here; and

(c) Defendants purposefully directed conduct here.

16. Personal jurisdiction exists because Defendants purposefully availed themselves of California, committed tortious conduct here, and directed threats and communications into this District.

17. Additionally, this instant case flows naturally out of the former Medlink v. Maddox case, which Diveroli initiated in this District and litigated here for over two years before essentially abandoning his case.

## III. PARTIES

18. Plaintiff Maddox Defense is a California corporation headquartered in San Diego.

19. Plaintiff EVTV is a Delaware corporation with operations in California.

20. Defendant Diveroli is an individual residing in Florida.

21. Defendant VDA Acquisitions is a Nevada LLC used to pursue Diveroli's (purported) fuel-related activities.

22. Defendant Kingbird is a Wyoming LLC through which Diveroli acquires small share blocks to launch derivative suits.

## IV.    GENERAL FACTUAL ALLEGATIONS

23.    For several years, Defendant Diveroli has operated a calculated and predatory business model built around litigation leverage, manufactured shareholder status, and coercive business pressure. Diveroli, often acting through intermediaries and his agents, such as Bird, repeatedly targets companies by quietly acquiring small amounts of stock, threatening ruinous derivative litigation, and then coercing the company's principals into entering transactions that financially benefit Diveroli and his associates. As Bird himself admitted to Maddox, Diveroli has "done this thirteen times," including instances where Diveroli invested in companies solely because "the company was worth $5 million, but the D&O was worth $10 million"—revealing that the goal was always to monetize litigation threats rather than improve corporate governance or shareholder value.

### A.    The Medlink Gown Litigation and the First Use of "Business Deal for Lawsuit Dismissal"

24.    Diveroli's pattern of weaponizing litigation began no later than 2022 with the Medlink medical-gown lawsuit against Maddox Defense. Although the claims were meritless and ultimately collapsed, Diveroli used the litigation as leverage to initiate a longstanding pressure campaign. Throughout 2022 and 2023, Bird—acting as Diveroli's agent—repeatedly told Maddox that the lawsuit would "go away" if Maddox Defense simply did business with Diveroli. This was the earliest example of Diveroli's quid-pro-quo strategy: litigation as the stick, a coerced business transaction as the supposed carrot.

### B.    The Fraudulent Fuel Venture and International Due Diligence Deception

25.    In mid-2023, Bird introduced Diveroli's next scheme: a fuel-supply venture represented as a multimillion-dollar opportunity and, critically, as a mechanism to resolve the gown litigation. Diveroli represented—through Bird and directly—that he

controlled or had guaranteed access to refinery-level petroleum allocations from Reliance Industries, one of the world's largest energy companies.

26. Relying on these representations, Maddox Defense incurred substantial expense traveling to India to conduct diligence. Once there, Maddox met with senior executives at Reliance, Bharat Petroleum, Indian Oil, and other major petroleum entities. These high-level executives unanimously confirmed that Diveroli had no relationship whatsoever with any of the refineries, had no allocation authority, and was entirely unknown in the Indian petroleum sector. Diveroli's purported "Reliance contact" was revealed to be an outside bookkeeper with no corporate position or ability to facilitate supply.

27. With the fraud exposed, the fuel venture collapsed. Diveroli never produced a single barrel of fuel, a single allocation letter, a single shipping schedule, or any legitimate performance. Shortly thereafter, his own Medlink litigation fell apart for failure to prosecute—further demonstrating his pattern of filing lawsuits not to litigate them, but to leverage them.

**C.     The Fenix Oro Gold-Mining Scheme and Renewed Coercive Pressure**

28. By 2025, Diveroli shifted to a new pressure mechanism: forcing Maddox, EVTV, and Maddox Defense into a speculative gold-mining venture involving Fenix Oro. This plan was again funneled through Bird, who framed the deal as the only way to prevent Diveroli from unleashing another wave of litigation. Bird explicitly told Maddox: "If the Fenix gold deal closes, Efraim will drop everything."

29. Bird further disclosed that Fenix Oro had agreed to secretly pay Diveroli $2–3 million if EVTV executed the transaction—a payment that would occur only if EVTV agreed to dilute more than 90% of its shareholders and turn board control over to Fenix-affiliated individuals without disclosing their related-party status to the SEC or Nasdaq. The proposed deal required massive dilution, concealed control changes, and

nondisclosure of affiliate relationships—conduct that would plainly violate federal securities law.

30.    The "gold deal" was not a bona fide business opportunity. It was, from inception, another coercive mechanism intended to force Maddox Defense, and later EVTV, into a transaction that would funnel money to Diveroli while crippling the companies.

**D.    Escalating Threats and the Derivative Litigation Ambush**

31.    When the Fenix Oro scheme failed to materialize during the fall of 2025, Diveroli escalated to derivative-litigation threats. Through his entity Kingbird, Diveroli issued litigation-preservation notices, demand letters, and draft lawsuits accusing Maddox Defense, EVTV, and others of misconduct entirely unrelated to any legitimate shareholder concern.

32.    The threatened derivative action was designed not to protect EVTV, but to destroy it if the gold-mining transaction did not close. Diveroli's demands were timed to sabotage ongoing financing negotiations, disrupt banking relationships, and create the appearance of corporate instability—manufactured crises leveraged to force acceptance of the Fenix Oro terms.

**E.    The December 4, 2025 Call: Direct Admissions of Extortion and Conspiracy**

33.    The coercive scheme reached its apex on December 4, 2025, during a telephone call in which Bird made a series of explosive admissions demonstrating the coordinated nature of Diveroli's operation:

   a.   Litigation as extortion: Bird stated plainly that if the Fenix Oro deal did not close, "he'll file immediately."

   b.   Interference with EVTV's bankers: Bird admitted that Diveroli had already sent threatening letters to AGP and that "the bankers are scared to talk to you," intentionally sabotaging EVTV's financing.

COMPLAINT

c. Market destruction threats: Bird warned, "Once a derivative is filed, no one will do business with you."

d. Pure financial motive: He acknowledged that Diveroli's true objective was money: "All he wants is money."

e. Pattern of abuse: Bird emphasized that Diveroli had "11 or 12 situations like this going now," that he was "rounding up shareholders" and "filing 13Ds" to manufacture control battles, and that he had recently executed the same playbook against another company, exploiting its $10 million D&O insurance.

f. Receivership tactics: Bird described Diveroli's strategy to push EVTV into receivership by fabricating claims of insolvency.

g. Coordinated conspiracy: Bird urged Maddox to pressure EVTV's leadership to accept the Fenix Oro deal, closing the loop: litigation threats, market interference, financial extortion, and coerced transactions all converging into a single coordinated scheme.

34. These admissions reveal an integrated conspiracy among Diveroli, Kingbird, VD Acquisitions, and other yet-unknown associates to use litigation and market manipulation to coerce Maddox, EVTV, and Maddox Defense into highly unfavorable transactions designed solely to enrich Diveroli and his network.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION: CIVIL EXTORTION

(Against all Defendants)

35. Plaintiffs reallege all prior paragraphs as though fully set forth herein.

36. This action arises from a prolonged and escalating campaign of coercion, economic threats, and litigation abuse orchestrated by Diveroli, acting individually and through his alter-ego entities Kingbird and VD Acquisitions. Together, these defendants developed and executed a coordinated scheme: to threaten meritless litigation,

weaponize derivative lawsuits, and exploit false claims of corporate misconduct in order to force Plaintiffs—Maddox Defense Inc., EVTV, and affiliated individuals—into completing a wholly unrelated speculative transaction involving Fenix Oro, a gold-mining enterprise with which Diveroli had preexisting financial arrangements.

37.    Under federal and California law, civil extortion occurs where a defendant obtains, or attempts to obtain, property or economic advantage through wrongful threats, including threats of litigation made in  bad faith or for an improper purpose. Defendants' conduct meets every element:

    a.    Wrongful use of fear: Defendants threatened baseless litigation, receivership, and public filings designed to cause catastrophic reputational harm.

    b.    Wrongful threats of economic injury: Defendants threatened to interfere with banking relationships, destroy market confidence, and devalue Plaintiffs' publicly traded shares.

    c.    Intent to obtain property or advantage: Defendants sought to compel Plaintiffs into a multi-million dollar mining deal, to force EVTV to issue "fully diluted shares" to their associates, and to obtain personal payouts for Diveroli.

    d.    Absence of legitimate claim of right: Defendants' allegations were knowingly false, internally inconsistent, time-barred, or premised on contractual relationships they themselves had fraudulently induced.

38.    The law does not permit individuals to use litigation as a cudgel to force unwanted commercial transactions, to demand that companies dilute their shareholders, or to extract payments unrelated to any legitimate claim of right. Defendants' threats were wrongful, malicious, and undertaken with full knowledge that they lacked any legal or factual basis.

39.    As a direct and proximate result of Defendants' extortionate acts, Plaintiffs have suffered significant harm, including but not limited to:

    a. Legal fees incurred in preventing imminent and baseless litigation,

    b. Interference with banking and financing relationships,

    c. Loss of business opportunities,

    d. Reputational damage in capital markets,

    e. Internal disruption and emergency compliance burdens,

    f. Costs associated with responding to fraudulent demands and preservation letters, and

    g. Emotional distress for the individuals personally targeted.

40.    Plaintiffs are entitled to compensatory damages, punitive damages, injunctive relief, and all further remedies the Court deems proper.

## SECOND CAUSE OF ACTION: RICO – 18 U.S.C. § 1962(c)

(Against all Defendants)

41.    Plaintiffs re-allege and incorporate all prior paragraphs as though fully set forth herein.

42.    This action arises from a deliberate, coordinated, and long-running scheme by Diveroli, and his controlled entities VDA Acquisitions and Kingbird, to extract money, business opportunities, and corporate control from Plaintiffs Maddox Defense and EVTV through fraud, coercion, extortionate litigation threats, and deceptive manipulation of securities markets.

43.    For years, Diveroli, in his individual capacity and through various entities, such as Medlink, VD Acquisitions, and Kingbird, have operated a pattern of racketeering activity in which the filing, threatening, and misuse of civil litigation is weaponized to force business concessions and financial payments, creating a quid-pro-quo: enter the deal promoted by Diveroli—or face imminent, baseless lawsuits designed to damage reputations, destroy financing, and tank public companies' securities value.

11
COMPLAINT

44. Defendants Diveroli, VDA Acquisitions and Kingbird collectively constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4). This enterprise functions as an association-in-fact whose purpose is to:

    a. Manufacture or threaten litigation;

    b. Disseminate false accusations and contrived "shareholder grievances";

    c. Buy small positions in companies for the sole purpose of weaponizing securities litigation;

    d. Interfere with companies' financing relationships to create financial distress; and

    e. Pressure targeted companies into paying Diveroli or entering into self-serving transactions, including but not limited to the Fenix Oro scheme.

45. The enterprise is ongoing, organized, and structured around defined roles. Diveroli directs litigation, threats and pressure agents; Kingbird and VDA act as the entities through which litigation is executed; and all participants share in the proceeds of coerced settlements or extorted transactions.

46. Defendants engaged in a continuous pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). Their conduct includes multiple predicate acts of:

    a. Extortion under 18 U.S.C. §§ 1951–52 (Hobbs Act);

    b. Wire fraud under 18 U.S.C. § 1343;

    c. Mail fraud under 18 U.S.C. § 1341;

    d. Securities fraud under 18 U.S.C. § 1348;

    e. Obstruction of justice (through bad-faith litigation threats and evidence tampering);

    f. Interstate transportation of property obtained by fraud; and

    g. RICO conspiracy under § 1962(d).

47. These acts are not isolated. They reflect the same methods, the same purpose, and the same actors, repeated across multiple companies over a period of

years. On December 4, 2025, Bird openly admitted to Maddox and the EVTV team that Diveroli "has a whole business doing this," that he has done it "with 13 companies," and that he recently extracted "$13 million" from another public company using the same extortion-through-derivative-lawsuit strategy. Bird further admitted that Diveroli deliberately targets companies with substantial D&O insurance because "that's where the money is."

48.     Bird admitted that Diveroli sent demand letters to AGP, EVTV's investment bank, specifically to frighten lenders and disrupt financing, stating flatly: "Efraim interfered with your banking relationships." This conduct is extortionate under the Hobbs Act and constitutes racketeering activity.

49.     Plaintiffs have been injured in their property and business because of Defendants' RICO violations. Those injuries include:

    a.  Loss of financing opportunities for EVTV due to Diveroli's interference;

    b.  Legal fees incurred responding to manufactured and baseless litigation demands;

    c.  Reputational harm to EVTV in capital markets;

    d.  Delay or abandonment of legitimate corporate transactions;

    e.  Diversion of corporate resources;

    f.  Damage to Maddox Defense's business relationships; and

    g.  Coercive pressure to enter the Fenix Oro transaction.

50.     These damages flow directly and foreseeably from Defendants' racketeering conduct.

51.     Plaintiffs are entitled to all remedies under 18 U.S.C. § 1964, including:

    a.  Treble damages;

    b.  Attorneys' fees and costs;

    c.  Injunctive relief preventing further extortionate litigation acts;

d. Declaratory relief concerning the illegitimate nature of Defendants' derivative claims; and

e. Any further relief the Court deems just and proper.

## THIRD CAUSE OF ACTION: FRAUDULENT INDUCEMENT

(Against all Defendants)

52. Plaintiffs incorporate all preceding allegations as though fully set forth herein.

**A.    Diveroli's and Bird's Fraudulent Use of Business Deals as Litigation Leverage**

53. The fraud began years earlier when Diveroli and VDA initiated the Medlink gown litigation against Maddox Defense. As the case progressed, Bird—who was at the time acting as Maddox Defense's advisor, financial liaison, and self-styled intermediary—repeatedly communicated to Jason Maddox that Diveroli would "drop the lawsuit" if Maddox entered into a new business arrangement with Diveroli. These overtures were explicit. Bird told Maddox that "*doing business with Efraim would make the lawsuit go away*," thereby connecting litigation pressure with a coerced business deal. At no time did Bird disclose that he stood to gain from such an arrangement or that Diveroli had been feeding him confidential information about the litigation to strengthen Diveroli's bargaining position.

54. This pattern—lawsuit threats followed by a business proposal marketed as the "solution"—became Diveroli's operational tactic.

**B.    The Fraudulent Fuel Agreement**

55. In 2023, Bird—acting on Diveroli's behalf and in coordination with him—introduced a fuel venture as the new "path to peace." Bird represented that Diveroli had secured extraordinary access to petroleum allocations through Reliance Industries in India. These representations included:

a. That VDA had refinery-level supply authority with Reliance;

14
COMPLAINT

b. That massive tanker quantities of petroleum were available for immediate contract;

c. That VDA had established connections with senior refinery executives;

d. That Maddox Defense would receive 42 million gallons per month guaranteed; and

e. That a Maddox/VDA fuel venture would eliminate Diveroli's intent to continue litigation.

56. All of these representations were false when made. Discovery later revealed that VDA had no relationship whatsoever with Reliance, that its purported Reliance "contact" was nothing more than an outside bookkeeper with no authority to sell fuel, and that Diveroli and VDA had fabricated the entire premise of upstream refinery access. Plaintiffs' due diligence trip to India—undertaken at substantial expense—resulted in meetings with multiple refinery executives, senior petroleum officials, and corporate heads, all of whom confirmed they had never heard of Diveroli, VDA, or any purported fuel allocation.

57. These facts demonstrate that Diveroli never intended to perform the Fuel Agreement at all. Rather, he intended to induce Maddox Defense to sign a multimillion-dollar contract by making false statements about supply capabilities he knew did not exist.

58. Diveroli made these representations knowingly and intentionally. He signed the Fuel Agreement based on fictitious "allocations," fabricated buyers, and nonexistent refinery relationships. He further instructed Bird to pressure Maddox Defense into signing by leveraging the Medlink litigation, telling Bird—and Bird then telling Maddox—that *entering the deal would make all legal problems go away."*

59. Diveroli's intent to defraud is further corroborated by his total failure to perform even a single contractual obligation under the Fuel Agreement. VDA never produced a buyer, supplier, allocation, bill of lading, shipment schedule, or any

evidence that it had the ability—or intent—to perform. This complete absence of performance is consistent with fraudulent inducement, not legitimate commercial difficulty.

60.    In 2025, when the fuel venture unraveled, Diveroli—again working through Bird—introduced a new scheme: a purported mining and gold-acquisition transaction involving Fenix Oro. Bird stated that if Maddox Defense or EVTV would "do the gold deal," Diveroli would withdraw all threatened lawsuits. The timeline shows that Bird repeatedly emphasized Diveroli's litigation threats as part of the sales pitch:

a.  "If Fenix walks, Efraim will file immediately."

b.  "This is his new business—buy stock, sue the company, force a receivership."

c.  "He's done this with 13 companies."

d.  "He already sent letters to AGP and scared your bankers."

e.  "All he wants is money."

61.    This constitutes not only fraud but also coercion: inducing Plaintiffs into a speculative and harmful transaction through the threat of baseless litigation.

62.    Bird further represented that Diveroli had pre-arranged financial benefits for himself through Fenix Oro, including a promised $2–3 million payout if the transaction closed. Neither Diveroli nor Bird disclosed this highly material fact to Plaintiffs, further establishing the fraudulent nature of the inducement.

63.    Plaintiffs reasonably relied on Diveroli's misrepresentations. Diveroli presented himself as an experienced government contractor with international commodity contacts. Plaintiffs invested substantial resources:

a.  Sending executives to India for refinery diligence;

b.  Allocating internal personnel to develop the fuel venture;

c.  Delaying other business opportunities;

16
COMPLAINT

d. Engaging in detailed negotiations over the gold transaction; and

e. Attempting to mitigate increasing litigation threats that Defendants tied to the transactions.

64. This reliance resulted in severe harm to Plaintiffs.

65. As a direct and proximate result of Defendants' fraudulent inducements, Plaintiffs suffered damages including:

a. Costs associated with the India due-diligence investigation;

b. Lost business opportunities during the period diverted to Defendants' fraudulent schemes;

c. Reputational harm in the fuel industry due to the failed Reliance deal;

d. Interference with banking, financing, and investor relationships;

e. Legal fees expended to respond to Diveroli's manufactured litigation threats;

f. Significant diminution in EVTV's market value due to Diveroli's derivative-suit threats;

g. Disruption to corporate operations caused by the extortionate ultimatum connected to the Fenix ORO deal; and

h. All other consequential, special, and punitive damages permitted by law.

66. Furthermore, Plaintiffs seek punitive damages, as Defendants' conduct was intentional, malicious, fraudulent, and part of a broader, admitted pattern of filing lawsuits to extort money from public companies.

## FOURTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH CONTRACT

*(Against all Defendants)*

67. Plaintiffs reallege and incorporate all prior paragraphs as though fully set forth herein.

17
COMPLAINT

68.     Defendants Diveroli, VDA, Kingbird, VD Acquisitions, and their close associate and agent Bird, intentionally and maliciously interfered with Plaintiffs' valid contractual relationships for the purpose of gaining improper leverage, extracting money, and coercing Plaintiffs into entering a speculative transaction with Fenix Oro that Plaintiffs had no independent business reason to pursue. Their actions constitute classic tortious interference under both federal common law and California law.

69.     Plaintiff Maddox Defense entered into valid and enforceable agreements with numerous counterparties, including financing institutions, vendors, banks, government-contracting partners, and corporate partners connected to EVTV. These agreements required confidentiality, exclusivity protections, and predictable business performance. Plaintiffs EVTV and Maddox Defense also maintained crucial contractual relationships with auditors, investment banks, uplisting consultants, underwriting firms, and other financing partners—all of which required reliability, stability, and freedom from manufactured litigation risk.

70.     Beginning in 2023 and escalating in 2024–2025, Diveroli and those acting in concert with him intentionally sought to disrupt these contractual relationships for the purpose of coercion. As detailed in the timeline provided by Plaintiffs and the evidence cited herein, Diveroli repeatedly used the threat of litigation as a weapon—not to vindicate legal rights, but to destroy Plaintiffs' contractual relationships unless Plaintiffs capitulated to his business demands.

71.     Throughout 2023 and 2024, Diveroli—acting through emissaries, including his agent Bird—threatened Maddox Defense that if it did not enter into the Fuel Agreement, Diveroli would pursue the "gown" lawsuit and "bury" Maddox and his company in litigation costs. When the Fuel Agreement was executed but VDA subsequently failed to perform, Diveroli then used the threat of reviving the Medlink litigation as leverage to pressure Maddox Defense to settle fabricated claims.

72. After the fuel venture collapsed, Diveroli escalated his interference campaign, weaponizing litigation threats against EVTV's existing contractual partners, including bankers, underwriters, and capital markets advisors. Bird expressly admitted that Diveroli had already contacted EVTV's bankers—including AGP—for the purpose of disrupting their relationship with EVTV. Bird stated plainly that Diveroli had sent them demand letters and "scared" them away from working with EVTV.

73. These acts of interference were not accidental. They formed part of a coordinated strategy. Bird informed EVTV's COO and President that Diveroli's "business model" involved buying shares of distressed companies, filing derivative suits, forcing receiverships, and collecting settlement payments, often targeting the companies' directors' and officers' insurance policies. Bird stated, in substance, that Diveroli had "done this with 13 companies," confirming the existence of an intentional and repeated scheme.

74. In late 2025, Diveroli and his corporate vehicles Kingbird and VD Acquisitions prepared and circulated draft lawsuits and demand letters containing false statements and referencing confidential information obtained from Bird, who was subject to nondisclosure agreements with Maddox Defense. These draft complaints—distributed before filing—were sent purposefully to third-party contractual partners of EVTV and Maddox Defense, including underwriters, auditors, and financing sources, with the intent to poison these business relationships and trigger contract defaults.

75. The purpose was transparent: Bird made clear that if EVTV did not proceed with the Fenix Oro gold-mine transaction, Diveroli would immediately file derivative litigation that would "destroy the company," cause bank partners to flee, and force a receivership. He further stated that Diveroli was using a trivial and disputed $70,000 allegation as leverage to push EVTV into insolvency—again for the purpose of interfering with EVTV's contractual relationships and extracting settlement funds.

76.    The interference succeeded in causing substantial disruption, including lender hesitation, bank disengagement, and delays in EVTV's contractual transactions that depended on operational stability. But for Defendants' interference, these contractual relationships would have continued in the ordinary course.

77.    Defendants knew of these contractual relationships. Bird, through his prior relationship with Maddox Defense, had direct access to Maddox Defense's inner workings and knew the identity of EVTV's bankers, advisors, auditors, and strategic partners. Diveroli acted upon this confidential information, intentionally contacting these institutions and making threats calculated to undermine Plaintiffs' ability to rely on those contracts.

78.    Defendants acted without any legal justification, for an improper purpose, and by improper means—namely, extortionate threats, false statements, breach of NDAs, circulation of draft lawsuits, misuse of litigation threats, leveraging confidential information, and unlawful pressure campaigns intended to destroy Plaintiffs' business relationships. Such conduct cannot be justified as litigation activity because the threats were made before filing, were knowingly baseless, and were deployed strategically to coerce Plaintiffs into a business deal that Diveroli stood to personally profit from.

79.    As a direct and proximate result of Defendants' tortious interference, Plaintiffs suffered and continue to suffer substantial damages, including lost financing opportunities, impairment of contractual rights, increased borrowing costs, lost business opportunities, reputational harm, and significant diversion of corporate resources. The interference also jeopardized pending and prospective government contracts, strategic partnerships, equity transactions, and uplisting plans.

80.    Plaintiffs therefore seek compensatory damages, punitive damages, attorneys' fees, injunctive relief preventing further interference, and all other remedies available at law and in equity.

## FIFTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### *(Against all Defendants)*

81. Plaintiffs reallege all prior paragraphs as though fully set forth herein.

82. This action arises out of a sustained and intentional campaign by Defendants—spearheaded by Diveroli and aided by his agents and confidants, including Bird—to obstruct, sabotage, and ultimately destroy Plaintiffs' prospective economic relationships and business opportunities for the purpose of coercing Plaintiffs into entering a highly speculative and unwanted gold-mining transaction with Fenix Oro, or, alternatively, extracting cash payments to Diveroli and his entities under the threat of manufactured shareholder litigation.

83. At all relevant times, Plaintiffs Maddox Defense and EVTV had substantial and identifiable prospective economic relationships with numerous outside parties—including investment banks (such as AGP and other placement agents), institutional investors, financial partners, potential joint-venture partners, and lenders. These relationships were not speculative: Plaintiffs were actively engaged in financing discussions, business development negotiations, and strategic planning involving third-party advisors, brokers, and institutions.

84. These prospective relationships were essential to the ongoing operations and financial stability of EVTV and Maddox Defense, and Defendants were fully aware of this fact. Indeed, evidence shows Diveroli studied Plaintiffs' financial disclosures, monitored their SEC filings, and tracked their financing activities in order to calibrate his pressure campaign.

85. Defendants understood precisely how dependent Plaintiffs were on their business relationships. Bird, acting as an agent for Diveroli, expressly stated to Jason Maddox:

    a. "Once a derivative is filed, no one will do business with you."

    b. Banks and institutional partners were already "scared to talk" to Plaintiffs because Diveroli had contacted them behind the scenes.

    c. Diveroli's plan was to "use insolvency" and "receivership threats" as leverage.

86. Defendants thus possessed detailed knowledge of Plaintiffs' business dealings and knew that interference—even subtle interference—would jeopardize those prospective economic advantages.

87. Defendants engaged in intentional, wrongful conduct wholly unrelated to legitimate business competition, including but not limited to interfering with Plaintiffs' banks and finance partners, inappropriate threats of litigation to coerce business dealmaking, and dissemination of privileged and confidential information in violation of nondisclosure agreements.

88. Evidence shows Diveroli sent demand letters directly to EVTV's bankers (e.g., AGP) and other financial intermediaries, falsely representing that Plaintiffs faced imminent derivative litigation based on fabricated or exaggerated allegations. Bird admitted on a December 4, 2025 phone call that the bankers "were scared to talk to you" because Diveroli had reached out to them and "interfered with your banking relationships."

89. This conduct was not protected petitioning activity; it was wrongful in every sense: the statements were knowingly false, made for the purpose of derailing financial relationships, and timed to coincide with Diveroli's attempt to force Plaintiffs into the Fenix Oro gold transaction.

90. Defendants repeatedly threatened baseless shareholder litigation—often in writing—unless Plaintiffs acquiesced to the gold deal promoted by Fenix Oro. Bird bluntly relayed Diveroli's ultimatum: if EVTV "didn't do the deal" with Fenix Oro, Diveroli would "file immediately" and destroy EVTV's capital-raising prospects.

91.    Such threats constitute independently wrongful conduct because they leverage knowingly meritless litigation as a tool of extortion and business coercion. Courts uniformly recognize the bad-faith use of litigation threats as a sufficient basis for a tortious interference claim.

92.    Defendants, through Bird as their agent, disclosed confidential, NDA-protected financial and operational information about EVTV and Maddox Defense to Diveroli. This provided Diveroli with the precise details he needed to craft threatening letters, securities-style demands, and draft complaints filled with information he could not have lawfully acquired.

93.    This conduct violates common-law duties of confidentiality, constitutes independent torts, and also demonstrates that the interference was deliberate and strategic.

94.    As a direct result of Defendants' actions:

    a.  Banking partners hesitated or paused active financing discussions.

    b.  Institutional investors backed away from pending transactions.

    c.  EVTV and Maddox Defense faced immediate and measurable reputational harm.

    d.  Plaintiffs were forced to divert resources to defend against meritless litigation threats.

    e.  Plaintiffs' ability to raise capital, complete contracts, and maintain normal operations was severely impaired.

95.    This disruption was neither hypothetical nor incidental. Defendants intended for Plaintiffs' business relationships to collapse unless Plaintiffs submitted to Diveroli's financial demands or the coerced gold-mine transaction.

96.    Plaintiffs have suffered substantial damages, including:

    a.  Loss of financing opportunities;

    b.  Increased cost of capital;

    c.  Loss of confidence from market participants and business partners;

    d.  Reputational harm in the investment and defense-contracting sectors;

    e.  Attorneys' fees and costs associated with responding to threats; and

    f.  Economic losses from paused or abandoned negotiations.

97.    Additionally, Defendants' scheme was designed to extract from Plaintiffs participation in a highly dilutive transaction that would have stripped EVTV of corporate control and diverted millions of dollars in value to Diveroli and his affiliates. Plaintiffs are entitled to recover all damages proximately caused by the interference, including punitive damages due to the malicious, fraudulent, and oppressive nature of Defendants' conduct.

### SIXTH CAUSE OF ACTION: ABUSE OF PROCESS

*(Against Defendants Diveroli, Kingbird Ventures, and VD Acquisitions)*

98.    Plaintiffs reallege and incorporate all prior paragraphs as though fully set forth herein.

99.    Defendants Diveroli, Kingbird and VD Acquisitions have intentionally weaponized the judicial process as a means of coercion, leverage, and economic pressure wholly unrelated to the legitimate resolution of any bona fide legal dispute. The record demonstrates that the threatened derivative lawsuits against EVTV and the threatened contract-based litigation against Maddox Defense were never pursued for the purpose of obtaining judicial redress; they were deployed as bargaining chips in a broader scheme designed to force Plaintiffs into a speculative, highly unfavorable gold-mining transaction with Fenix Oro—a deal orchestrated and promoted by these same Defendants.

100.    For more than two years, Diveroli has repeatedly used litigation threats as a form of commercial pressure. Beginning with the Medlink gown lawsuit, and continuing through the failed fuel venture, Defendants' invocation of legal proceedings has been consistently tied to an extraneous objective: compelling Plaintiffs to enter a

business deal advantageous to Diveroli or his affiliates. By the time Diveroli announced the Kingbird derivative action and the VD Acquisitions contract suit, the purpose of the threatened filings had become unmistakable: to force Maddox, Maddox Defense, and EVTV into accepting the Fenix Oro transaction as the price of avoiding litigation.

101. This intent is confirmed by Diveroli's agent, Bird's, own admissions. Bird repeatedly communicated that if Plaintiffs would agree to participate in the Fenix Oro acquisition or associated financing, the threatened lawsuits would "disappear," but if Plaintiffs refused, Diveroli would "file immediately." Bird further explained—while acting in close coordination with Diveroli—that Diveroli's "business model" involved purchasing shares in public companies for the sole purpose of filing derivative claims, targeting D&O insurance, and extracting payouts from businesses unconnected to any legitimate shareholder grievance. Bird specifically cited Diveroli's alleged prior success in obtaining multimillion-dollar settlements through this tactic and represented that Diveroli intended to replicate that strategy against EVTV unless Plaintiffs capitulated to the gold-deal ultimatum.

102. The abuse of process is further evidenced by the timing and substance of the threatened filings. Diveroli, through counsel, transmitted a demand letter and draft derivative complaint on behalf of Kingbird Ventures that relied heavily on misstatements, recycled accusations from dismissed litigation, and allegations that Diveroli knew to be false. The letter openly tied the threat of litigation to the ongoing Fenix Oro negotiations, stating that immediate filing would occur if Plaintiffs did not respond to business-deal demands by a specified deadline. This conduct reveals that Defendants were not seeking judicial enforcement of rights but rather using the machinery of the courts as a bludgeon to obtain concessions in a commercial negotiation.

103. The connection between litigation threats and Defendants' ulterior commercial objective could not be clearer than in Bird's December 4, 2025 call. Bird,

acting on behalf of Diveroli, explicitly stated that if Fenix Oro "walked," Diveroli would file the derivative actions instantly; that Diveroli had already interfered with EVTV's banking relationships to increase pressure; and that Diveroli's sole goal was "money," not legitimate governance reform or contract enforcement. Bird further admitted that Diveroli hoped to force EVTV into receivership, creating additional leverage, and that Diveroli viewed the lawsuits primarily as a pathway to accessing the Company's D&O insurance limits.

104.   Such statements and actions constitute a textbook abuse of process. The threatened lawsuits were conditioned not on Plaintiffs' conduct regarding corporate governance or contractual performance, but on whether Plaintiffs would agree to financially benefit Diveroli through a separate gold-mining transaction entirely outside the scope of any claimed grievance. Defendants invoked the power of the courts for a purpose the process is not designed to serve: extorting financial gain, compelling strategic corporate transactions, and coercing Plaintiffs into relinquishing control of their businesses. This is precisely the type of collateral, illegitimate objective that the tort of abuse of process is intended to prohibit.

105.   As a direct and proximate result of Defendants' wrongful use and threatened use of legal process, Plaintiffs have suffered substantial damages, including but not limited to: disruption of ongoing business operations; loss of financing and banking relationships; legal fees incurred to defend against baseless and pretextual claims; reputational harm; interference with corporate governance and investor relations; and the substantial costs associated with responding to meritless preservation demands, derivative threats, and manufactured litigation emergencies.

106.   Defendants' conduct was intentional, malicious, and carried out with full knowledge of its wrongful nature. Plaintiffs therefore seek compensatory damages, punitive damages, attorneys' fees, and all other relief permitted under law.

## SEVENTH CAUSE OF ACTION: DECLARATORY RELIEF

### (28 U.S.C. §§ 2201–2202)

107.    Plaintiffs reallege all prior paragraphs as though fully set forth herein.

108.    This case presents an actual, immediate, and justiciable controversy requiring the Court to issue declaratory relief to resolve the parties' legal rights and obligations. Defendants Diveroli, Kingbird and VDA Acquisitions—acting individually and in concert—have asserted that they possess various legal claims against Plaintiffs. These asserted claims include: (1) an alleged derivative claim on behalf of EVTV; (2) alleged contractual claims under the October 2023 fuel contract; (3) alleged fraud claims against Maddox Defense; (4) alleged corporate-governance claims against EVTV and its officers; and (5) threatened "receivership" actions and efforts to seize control of EVTV through litigation.

109.    Defendants have leveraged these asserted claims to threaten immediate litigation unless Plaintiffs agree to enter unrelated business transactions—principally the proposed gold-mining transaction with Fenix Oro—or pay Diveroli or his affiliates substantial sums of money.

110.    These threats have not been speculative. Diveroli and his attorney have delivered multiple demand letters asserting that Maddox Defense and EVTV owe substantial sums; have threatened expedited litigation in multiple jurisdictions; and have attached draft complaints to give weight to their threats.

111.    In addition, Diveroli, individually and through his agent, Bird, have repeatedly and explicitly stated that lawsuits will be filed unless Plaintiffs capitulate to Diveroli's business demands, including the completion of the gold-mine transaction. Bird has admitted that Diveroli "has a whole business doing this," describes prior instances where Diveroli purchased shares of companies solely to file derivative suits, and has stated plainly that Diveroli's objective is not corporate governance but money.

27
COMPLAINT

These are not vague or idle threats—they have been expressly presented as imminent legal actions.

112. Yet the claims Defendants threaten to bring are legally and factually baseless.

113. First, Diveroli and VDA materially breached the Fuel Trading Venture Agreement and cannot now claim damages arising from their own non-performance.

114. Second, the "derivative claim" Kingbird purports to bring against EVTV is not supported by federal or Delaware law. It is a manufactured claim based on Diveroli's newly-acquired shares purchased solely for the purpose of filing litigation and coercing a payout—conduct Delaware courts have repeatedly condemned.

115. Third, any purported claims based on the gown litigation are meritless, as that action collapsed due to divergence's misconduct and failure to prosecute.

116. Fourth, Defendants have no legitimate claim to receivership, injunction, or other equitable remedies, because they cannot demonstrate any underlying legal right, actual injury, or good-faith concern for EVTV's governance.

117. Despite having no viable claims, Defendants have wielded the threat of litigation as a coercive weapon to interfere with Plaintiffs' business operations, investor relations, credit access, and banking relationships.

118. These threats have already caused substantial harm: investment banks (including AGP) have withdrawn engagement, financing discussions have stalled, and potential investors have been deterred. EVTV and Maddox Defense are now under an active cloud of threatened litigation that Defendants explicitly tie to their demand that Plaintiffs close the gold-mine transaction or pay Diveroli personally.

119. An actual controversy exists because Defendants insist they possess actionable claims, continue to threaten imminent legal action, and have caused ongoing commercial injury through their threats.

120. Plaintiffs deny the existence of any such legal claims and assert that Defendants: (1) materially breached the Fuel Agreement; (2) lack standing to pursue derivative claims under Delaware law; (3) lack any factual basis for claims of fraud, breach, or mismanagement; and (4) are engaging in extortionate, bad-faith litigation threats in order to force Plaintiffs into unrelated commercial transactions.

121. Declaratory relief is necessary to resolve these issues and prevent further coercion. Without a judicial determination of the parties' rights, Defendants will continue to weaponize fictitious legal claims such as leverage, interfere with Plaintiffs' access to capital, and pressure Plaintiffs into transactions that are harmful to the companies and their shareholders.

122. Plaintiffs therefore request a declaration that:

a. Defendants have no enforceable claim against Plaintiffs arising from the Fuel Trading Venture Agreement, because Defendants materially breached the agreement and failed to perform any of their obligations.

b. Kingbird Ventures has no standing to bring a derivative action against EVTV, because its shares were acquired solely for the purpose of litigation, in bad faith, and without any legitimate shareholder purpose.

c. Defendants have no basis under federal, state, or Delaware law to seek receivership, dissolution, or any corporate-governance remedy against EVTV.

d. Defendants' threatened lawsuits, complaints, and demand letters do not state viable legal claims and cannot lawfully be used as leverage to compel EVTV or Maddox Defense to enter unrelated business transactions.

e. Any threatened litigation premised on the fuel contract, the gown litigation, or alleged EVTV mismanagement is frivolous, brought in bad faith, and unsupported by law or fact.

COMPLAINT

  f. EVTV's officers and directors have not breached any fiduciary duty to shareholders, and Defendants' contrary assertions are legally unfounded and factually false.

123. A declaration will serve the purposes of the Declaratory Judgment Act by conclusively resolving an active controversy, eliminating uncertainty, and preventing further coercive litigation tactics. Plaintiffs therefore seek declaratory relief pursuant to 28 U.S.C. §§ 2201–2202, together with costs, attorneys' fees, and any further relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION:  INJUNCTIVE RELIEF**

(Against All Defendants)

124. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

125. This action arises from an ongoing and escalating pattern of coercive conduct, extortionary threats, and bad-faith litigation tactics perpetrated by Defendants Diveroli, Kingbird, VDA Acquisitions and other affiliated individuals. For more than two years, these Defendants have used the specter of litigation—much of it admittedly baseless, manufactured, or pretextual—to pressure Plaintiffs Maddox Defense and EVTV into business transactions from which Diveroli and his affiliates stand to profit personally.

126. When Plaintiffs resisted such demands or insisted on legitimate due diligence, Defendants escalated their threats, culminating in an ultimatum: complete the "Fenix Oro" transaction or face immediate lawsuits designed to cripple Plaintiffs financially, destroy their ability to raise capital, and force a receivership.

127. The need for injunctive relief is underscored by Defendants' own admissions. Bird, acting as Diveroli's agent, repeatedly acknowledged that Diveroli intends to file derivative litigation—not to vindicate corporate rights, but to "destroy the

30

COMPLAINT

company unless he gets paid," to "target the D&O insurance," and to force a settlement by rendering normal business operations impossible.

128. On multiple calls with Plaintiff representatives, Bird stated: "If the gold deal walks, he will file immediately," and warned that Diveroli's scheme is based on taking small positions in public companies, initiating "emergency" shareholder litigation, pushing the entity toward insolvency, and extracting payments in exchange for withdrawing the lawsuits.

129. These threats were not idle; they were backed by concrete, deliberate steps toward executing the scheme. Diveroli transmitted draft complaints, preservation letters, and demand letters citing information obtained through Bird's violation of nondisclosure agreements. They interfered with Plaintiff EVTV's investment banking relationships by sending litigation threats to AGP and others. Defendants contacted prospective financiers and business partners for the sole purpose of frightening them, damaging Plaintiffs' credibility, and creating leverage for the coercive "gold deal." Each attempt was calculated to compromise Plaintiffs' ability to operate normally or to raise capital—an outcome Defendants openly celebrated as a useful pressure tactic.

130. Unless enjoined, Defendants will continue to exploit the judicial process to inflict irreparable harm on Plaintiffs. Their wrongful acts cannot be remedied solely by monetary damages because the threatened harm includes: (1) loss of investor confidence; (2) collapse of pending financing deals; (3) severe market disruption for a publicly traded company; (4) impairment of banking relationships; (5) threatened receivership petitions; (6) reputational damage; and (7) the chilling effect on Plaintiffs' ability to conduct their business. Once such damage occurs, it cannot be undone. The derivative litigations threatened by Defendants—even if ultimately dismissed as frivolous—would remain on the public docket, deterring investors, destabilizing operations, and jeopardizing EVTV's ability to remain listed on NASDAQ.

131.   Moreover, Defendants' conduct constitutes a classic "abuse of process" and fits squarely within the traditional grounds for equitable relief. Their threatened and actual actions are not undertaken for the purpose of vindicating legal rights, but for the improper purpose of compelling Plaintiffs to enter an unwanted transaction, to surrender corporate control, and to pay Diveroli and his affiliates undeserved sums. In such circumstances, courts routinely grant injunctive relief to prevent irreparable harm and to protect the integrity of the judicial system.

132. A real and immediate threat of continued misconduct exists. Bird has stated unequivocally that Diveroli will file the sham derivative action "immediately" if the Fenix Oro transaction does not close on terms favorable to Diveroli. Defendants have already weaponized litigation drafts and banking interference as leverage and have shown that they will not hesitate to repeat or escalate these tactics. Absent an injunction, Plaintiffs will be forced to choose between capitulating to Defendants' unlawful scheme or facing the very business-crippling consequences Defendants openly intend to inflict.

133.   Plaintiffs further request that as part of the Court's equitable powers, the Court declare Diveroli a vexatious litigant and impose appropriate pre-filing restrictions. As detailed above, Diveroli has engaged in a documented pattern of abusive litigation practices, including filing or threatening meritless suits through shell entities, leveraging derivative claims for coercive business purposes, and openly admitting through intermediaries that litigation is used as a tool of pressure, not adjudication. The Ninth Circuit authorizes federal courts to issue pre-filing injunctions to prevent such abuses. See *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990); *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047 (9th Cir. 2007). Plaintiffs accordingly seek a narrowly tailored pre-filing injunction prohibiting Diveroli or any entity he controls, finances, or directs from filing any new action against Plaintiffs or their affiliates without first obtaining leave of court.

134.   Plaintiffs therefore seek a preliminary and permanent injunction restraining Defendants, and all persons acting in concert with them, from:

   a.   Filing or threatening sham, bad-faith, or extortionary litigation;

   b.   Interfering with Plaintiffs' banking, financing, or capital-raising relationships;

   c.   Disseminating or using confidential or NDA-protected information for leverage;

   d.   Communicating false or misleading statements to third parties regarding Plaintiffs' solvency, business operations, or alleged wrongdoing; and

   e.   Continuing any coercive efforts to force Plaintiffs into the Fenix Oro transaction or any other unwanted business deal.

135.   Such relief is necessary to prevent irreparable harm, protect Plaintiffs' constitutionally protected property and business interests, maintain the status quo, and ensure that Defendants cannot weaponize the judicial system to carry out an extortion-based scheme.

136.   Plaintiffs have no adequate remedy at law.

### NINTH CAUSE OF ACTION: CIVIL CONSPIRACY

*(Against All Defendants)*

137.   Plaintiffs re-allege and incorporate all preceding paragraphs as though fully set forth herein.

138.   This case presents a textbook example of a coordinated, multi-actor scheme in which the defendants acted in concert to achieve unlawful objectives they could not — and did not — accomplish individually.

139.   The wrongful acts described throughout this Complaint were not the product of isolated misconduct but were undertaken pursuant to an orchestrated plan involving Diveroli and his affiliated companies Kingbird and VD Acquisitions.

140.    These individuals and entities formed a cohesive alliance for the shared purpose of coercing Plaintiffs Maddox Defense and EVTV into highly unfavorable business transactions, extorting money and corporate control, and weaponizing frivolous litigation as leverage to force compliance with their demands.

141.    For approximately five years, Diveroli has relied on Bird as his agent and conduit—his messenger, his pressure-applicator, and his insider pipeline—who carried threats, conveyed ultimatums, transmitted confidential information, and executed Diveroli's coercive strategy from within the business relationships between Maddox Defense, EVTV, and third-party financiers. Bird's communications and conduct, as documented in emails, text messages, and recorded conversations, reflect not independent action but intentional participation in Diveroli's broader plan: to pressure Plaintiffs into entering speculative, high-risk deals (first the fuel deal, then the gold mining/Fenix Oro transaction) by tying them to ongoing or threatened litigation.

142.    The conspiratorial conduct escalated in 2025, when Diveroli—through Bird—explicitly tied the threatened shareholder derivative litigation and the VD Acquisitions lawsuit to EVTV's and Maddox Defense's willingness to complete the Fenix Oro transaction. Bird repeatedly conveyed Diveroli's "warnings" that refusal to comply would result in immediate lawsuits, receivership petitions, and reputational destruction.

143.    At the same time, Diveroli leveraged litigation already in draft form—demand letters, preservation notices, and complaints prepared by his attorneys—to amplify the pressure on Plaintiffs. Bird openly admitted that Diveroli's "business model" was to accumulate shares in public companies and then file lawsuits designed to cripple the companies, exhaust their insurance, and extract lucrative settlements.

144.    These coordinated acts were not coincidental. They were carried out pursuant to a shared, unlawful purpose:

   a.  To coerce Plaintiffs into entering a speculative international mining transaction for Diveroli's financial benefit;

   b.  To extort monetary or strategic concessions under threat of litigation;

   c.  To interfere with banking and financing relationships critical to EVTV's operations, including communications made to AGP and other institutions intended to instill fear and impede Plaintiffs' access to capital; and

   d.  To manufacture derivative litigation against EVTV and Maddox Defense based on information that could only have been obtained through Bird's breach of confidentiality obligations.

145. Each conspirator committed overt acts in furtherance of this unlawful scheme. Diveroli directed and controlled the litigation threats, paid for share acquisitions used to justify derivative standing, and generated draft complaints intentionally riddled with distortions. Bird transmitted threats, disclosed confidential and NDA-protected information, coordinated introductions to Fenix Oro, and pressed Maddox Defense and EVTV to capitulate by emphasizing the dire consequences of refusing Diveroli's demands. Kingbird and VD Acquisitions were used as corporate vehicles to carry out the litigation-based aspects of the scheme. Bird had access to Plaintiffs' internal affairs and to the confidential data Diveroli used in his threats.

146. The conspiracy caused Plaintiffs substantial harm. Plaintiffs have suffered actual and threatened lawsuits, reputational injury, disrupted banking and financing relationships, interference with corporate governance, internal operational uncertainty, and significant legal expense. Plaintiffs were forced to divert substantial time, resources, and energy away from business operations and toward mitigating Defendants' escalating campaign of threats, pressure, and coercion. The harm is ongoing, as Defendants have expressly threatened imminent litigation if Plaintiffs refuse to surrender to their demands.

147. Defendants acted intentionally, maliciously, and with conscious disregard for Plaintiffs' rights. Civil conspiracy does not require an independent tort; it requires only that defendants knowingly agreed to participate in wrongful conduct. Here, the underlying wrongful acts—including extortion, fraud, tortious interference, abuse of process, and RICO-predicate misconduct—are independently actionable and serve as the foundation for liability. But even if they were not, the evidence demonstrates a clear agreement, explicit coordination, and purposeful participation in a joint plan to injure Plaintiffs.

148. Accordingly, Plaintiffs seek compensatory damages, punitive damages, attorneys' fees where authorized by law, and all other relief this Court deems just and proper.

## TENTH CAUSE OF ACTION: UNFAIR COMPETITION – Bus. & Prof. Code § 17200

*(Against all Defendants)*

149. Plaintiffs reallege all prior paragraphs as though fully set forth herein. This action arises from a sustained pattern of predatory conduct carried out by Defendants Diveroli, VD Acquisitions, Kingbird, and those acting in concert with them. Their scheme consists of weaponizing litigation threats, trading on false representations, interfering in Plaintiffs' business relationships, and coercing Plaintiffs into entering unrelated high-risk transactions—most prominently, the proposed Fenix Oro mining deal. Together, these acts constitute unlawful, unfair, and fraudulent business practices prohibited by California Business & Professions Code section 17200.

150. The UCL's "unlawful" prong borrows violations of other laws and makes them independently actionable. Defendants' conduct violates multiple independent statutory and common-law duties, including:

    a. Federal RICO (18 U.S.C. § 1962) — through an enterprise engaging in extortion, mail/wire fraud, and bad-faith shareholder litigation threats;

b. Civil extortion — by tying fabricated lawsuits to demands for payment or transactional concessions;

c. Securities fraud — by purchasing small blocks of EVTV stock solely to weaponize derivative suits, coupled with disseminating false or misleading assertions about EVTV, Maddox Defense, and their executives;

d. Common-law fraud and fraudulent inducement — by knowingly misrepresenting the existence of fuel allocations, refinery relationships, and legitimate contractual performance;

e. Abuse of process — by drafting and threatening sham complaints for the purpose of economic leverage unrelated to any bona fide legal dispute; and

f. Tortious interference — by contacting EVTV bankers, advisors, counterparties, and business partners to scare them into terminating relationships with Plaintiffs.

151. Each of these violations independently renders Defendants' conduct "unlawful" under § 17200.

152. Defendants' conduct is also "unfair" because it violates established public policy, is unethical and unscrupulous, and harms Plaintiffs in a manner that provides no countervailing benefit.

153. For years, Diveroli has cultivated a strategy of identifying publicly traded companies, purchasing small equity positions, and then threatening catastrophic derivative litigation unless executives capitulate to financial demands or unrelated business deals. Bird confirmed these tactics on multiple recorded calls, describing Diveroli's pattern of suing companies, forcing receiverships, and targeting D&O insurance funds as a substitute for legitimate business activity.

154.   This business model is not merely harmful; it is predatory. It destabilizes businesses, chills investment, damages credit and banking relationships, and pressures executives into transactions they would never consider in a fair marketplace. The Fenix Oro transaction—attempted to be forced on Plaintiffs through threats, intimidation, and timed litigation demands—is a textbook example of unfair marketplace behavior the UCL was designed to prohibit.

155.   The harm inflicted on Plaintiffs is substantial: loss of credibility with investors and bankers, destruction of negotiations with AGP and other financing sources, internal operational disruptions, reputational damage, and the direct threat of coerced corporate reorganization under hostile terms. No legitimate business justification exists for Defendants' conduct.

156.   Defendants' business practices are also "fraudulent" in that they are deceptive, misleading, and likely to deceive members of the public—including shareholders, regulatory bodies, and potential investors.

157.  Defendants have repeatedly portrayed themselves as good-faith investors or counterparties when, in truth, they were concealing the following facts:

   a.  VD Acquisitions had no legitimate fuel allocation from Reliance or any other refinery, and its claimed relationships were fictional, as confirmed by Maddox Defense's meetings with India's top petroleum companies;

   b.  The derivative litigation against EVTV was not based on corporate governance concerns but was instead a pressure tactic to force Plaintiffs into the Fenix Oro transaction;

   c.  Bird's communications with Plaintiffs' bankers and potential investors were designed to create panic, deliberately misrepresenting EVTV's finances, legal exposure, and operational stability; and

   d.  Defendants concealed their coordinated relationship, including Bird's dual roles as:

    i.    a financial contractor for Maddox Defense,

    ii.    a confidant of Diveroli,

    iii.    and a conduit for threats and confidential information—much of which Bird obtained through nondisclosure agreements and then passed to Diveroli in violation of law and contract.

158.   These misrepresentations were calculated to mislead Plaintiffs and the market at large about the legitimacy of Defendants' intentions and the supposed necessity of entering the Fenix Oro transaction. As a direct and proximate result, Plaintiffs suffered economic harm, reputational damage, and severe business disruption.

159.   Plaintiffs have suffered substantial loss of money or property as a result of Defendants' unlawful, unfair, and fraudulent acts, including:

    a.  Costs associated with responding to fabricated litigation threats;

    b.  Lost or impaired financing opportunities;

    c.  Business disruption and reputational harm;

    d.  Diversion of executive resources;

    e.  Diminished enterprise value; and

    f.  Harm to Maddox Defense, EVTV, and their shareholders.

160.   Under the UCL, Plaintiffs are entitled to:

    a.  Restitution, including but not limited to recovery of money wrongfully obtained or business value wrongfully diminished through Defendants' scheme;

    b.  Injunctive relief to prohibit Defendants from continuing their extortionate litigation threats, interfering with Plaintiffs' business relationships, misrepresenting their business capabilities, or pressuring Plaintiffs into the Fenix Oro transaction or similar coercive arrangements; and

COMPLAINT

c. Declaratory relief establishing that Defendants' threatened lawsuits and business-deal coercion violate California law and cannot lawfully be used as economic leverage.

161.    Because the UCL's remedies are equitable in nature, Plaintiffs seek full restitution and injunctive measures to prevent Defendants from continuing to deploy predatory litigation and false business inducements in California's marketplace.

## PRAYER FOR RELIEF

Plaintiffs request:

1. Treble damages under RICO.
2. Compensatory and consequential damages in amounts to be proven at trial.
3. Rescission or cancellation of any coerced agreements.
4. Injunctive relief barring further threats, interference, or derivative suits.
5. Declaratory relief that:
    a. Diveroli has no legitimate shareholder-standing
    b. any threatened derivative litigation is abusive and invalid
6. Attorney's fees and costs.
7. Any further relief the Court deems proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: May 13, 2026                    RESPECTFULLY SUBMITTED,


                                       /s/ Sean M. Jones__
                                       SEAN M. JONES, ESQ./LL.M.
                                       Attorney for Plaintiffs,
                                       MADDOX DEFENSE, INC. and
                                       ENVIROTECH VEHICLES, INC.

COMPLAINT